## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 16 2018, 7:36 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Kristopher G. Richter
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kristopher G. Richter,<br>*Appellant*,<br><br>v.<br><br>Kaylie E. Sexton,<br>*Appellee*. | August 16, 2018<br><br>Court of Appeals Case No.<br>71A03-1710-JP-2394<br><br>Appeal from the St. Joseph Probate Court<br><br>The Honorable James C. Stewart-Brown, Magistrate<br><br>Trial Court Cause Nos.<br>71J01-1601-JP-46<br>71J01-1601-JP-47 |

**Brown, Judge.**

[1] Kristopher G. Richter ("Father") appeals the trial court's Order Confirming Paternity. Father raises six issues which we revise and restate as:

  I.   Whether the trial court abused its discretion in ordering Father to pay attorney fees;

  II.  Whether the court erred in ordering Father to undergo a psychological examination;

  III. Whether the court erred in its determination of Father's child support obligation;

  IV.  Whether the court erred in not granting Father's motion to change judge;

  V.   Whether the court erred in granting Mother primary physical and legal custody; and

  VI.  Whether the court abused its discretion in denying Father's motion for a continuance.

We affirm.

### Facts and Procedural History

[2] Kaylie E. Sexton ("Mother") and Father had two children: G.R., born in June 2012, and E.R., born in June 2013. On January 20, 2016, Mother filed a Petition to Establish Rights Incident to Paternity Pursuant to Ind. Code § 16-37-2-2.1.[1] On January 27, 2016, Mother filed a "Verified Emergency Petition to Establish Parenting Time, for Supervised Parenting Time and for Appointment

---

[1] The petition included in the record lists only G.R. and cause number 71J01-1601-JP-46 ("Cause No. 46"). The record does not include a copy of the chronological case summary for cause number 71J01-1601-JP-47 ("Cause No. 47"). In his statement of the case, Father cites to Mother's petition and asserts that she was seeking full custody of G.R. and E.R. On March 7, 2017, the trial court consolidated Cause Nos. 46 and 47.

of GAL." Appellant's Appendix Volume II at 32. That same day, the court entered an order denying Mother's petition "as no emergency [was] alleged," stating that it reviewed both Paternity Affidavits, and noting that parents may have an agreement to share joint legal custody, that a provision clearly indicated that Mother would have primary physical custody, and Mother therefore had the sole right to determine the physical location and day-to-day care of her children subject to the terms of the Paternity Affidavit.

[3] On March 3, 2016, Father filed a motion for continuance stating that the parties had agreed to a continuance "in order to hold a possible 4-way meeting." *Id.* at 39. That same day, the court granted the continuance and scheduled a hearing for April 14, 2016.

[4] In April 2016, Mother's counsel filed a Notice of Agreed Guardian ad Litem asserting the parties agreed that Brian Gates shall be appointed guardian ad litem, and Gates was appointed.

[5] On May 4, 2016, Father's attorney withdrew his appearance and Father then proceeded *pro se*. On May 20, 2016, Father filed a Motion to Request Hearing, a Motion to Establish Paternity, a motion to vacate the court's April 22, 2016 order appointing the guardian ad litem, and a motion for stay. On May 27, 2016, Father filed a Verified Emergency Petition for Physical Custody. On June 6, 2016, the court entered an order stating that it did not believe an emergency existed and interpreting Father's pleadings as an objection to Mother's relocation.

On June 29, 2016, the court held a status hearing and entered an order which vacated the appointment of Gates, indicated it would appoint another attorney to serve as guardian ad litem, and ordered parents to fully cooperate with the guardian ad litem investigation and completion of the report. On July 5, 2016, the court appointed Nicholas Artusi ("GAL Artusi") as the guardian ad litem.

On July 15, 2016, Father filed a verified motion for contempt alleging Mother denied his right to visitation on Memorial Day weekend, intended on taking the children out of town without his permission, and interfered with child custody. On July 20, 2016, the court entered an order finding that Father based his motion for contempt on the assumption that he and Mother share joint legal custody, and noting that the Paternity Affidavit executed by the parties indicates that Father and Mother wished to share joint legal custody and that this provision "to be considered valid, must be accompanied with genetic test results obtained within 60 days of the execution of the affidavit and same to be submitted to the Health Department also within 60 days of execution," and "[f]or this reason, until Father can show otherwise, Mother has sole legal and physical custody and any parenting time is at her sole discretion." Appellant's Appendix Volume III at 2.

On August 9, 2016, Father filed notices of subpoenas duces tecum requesting the medical or mental health records of G.R. and E.R. and requests for production of documents. It also filed a "Motion to Vacate Order and Compel an Order to Show Cause" alleging in part that he submitted to a DNA test and

moving the court to enter the test "as further authentication of the paternity of his 'Children'." *Id.* at 31, 34.

[9] On September 19, 2016, Father filed subpoenas duces tecum for Mother's cell phone records and the children's daycare records. Mother followed with an objection to Father's non-party discovery requests and request for attorney fees. On September 23, 2016, Father filed an "OPPOSITION" to Mother's objection. Appellant's Appendix Volume IV at 2-7.

[10] On December 8, 2016, the court held a hearing and entered an order stating that Mother, GAL Artusi, and Mother's attorney appeared for the hearing and Father did not appear, and dismissed Father's August 9, 2016 motion with prejudice.

[11] On December 29, 2016, Father filed a Verified Motion for Modification of Visitation, and on December 30, 2016, he filed a motion to change judge and a motion for stay. On January 3, 2017, he filed an "Amended Motion to Vacate Order," asserting in part that he sought "relief from the *Order Dismissing Motion to Vacate Order and Compel an Order to Show Cause*." *Id.* at 94-95. That same day, GAL Artusi filed a Motion in Opposition to Father's Motion to Vacate Order. On January 4, 2017, the court denied Father's motion to change judge.

[12] In a letter dated January 6, 2017, and titled Supplemental Guardian Ad Litem Report to the Court,[2] GAL Artusi recommended in part that Mother be granted physical custody of the children, the parties be granted legal custody of the children, and Father be granted parenting time in accordance with the Indiana Parenting Time Guidelines. The report also recommended:

> 5) Father is required to undergo an initial intake with Oaklawn or another facility equivalent to Oaklawn. If Father is recommended to undergo additional services he is to follow the recommendation of the health care provider. Father is instructed to sign all necessary release forms to allow me access to his files and if medication is prescribed that information is made available to all parties in the case including what the medication is, how often it is taken, side effects and the length in which the medication will be taken.

Appellant's Appendix Volume V at 81.

[13] On February 1, 2017, Father filed subpoenas duces tecum for Mother's salary stubs or wage statements and income tax returns and Mother's witness list or witness affidavits for hearing. On February 3, 2017, Father filed a motion for enlargement of time to respond to the Supplemental Guardian ad Litem Report to the Court and a Motion to Certify Interlocutory Order and for Stay requesting that the court certify for appeal its January 4, 2017 order denying his motion for change of judge. On February 7, 2017, he filed an Amended

---

[2] The report stated: "This is the first report issued on this matter." Appellant's Appendix Volume V at 72.

Motion to Strike asserting in part that the court should strike GAL Artusi's supplemental report and "specifically recommendation number five (5), as scandalous matter that has no merit." Appellant's Appendix Volume IV at 126. On February 15, 2017, he filed a Motion for Relief from Order pursuant to Ind. Trial Rule 60(B).

On March 2, 2017, the court held a hearing. The court acknowledged that the parties had discovery to exchange and, when asked by the court what Father had for Mother's attorney, he answered in part that he had "the TPD actual contract and copy of the check from the workmans comp payment, and then I also have proof of income from unemployment." Transcript Volume II at 36. In discussing discovery Father sought, Mother testified that the children had been covered by insurance through her employer up until three months earlier and had been on Medicaid or the Healthy Indiana plan since then. *Id.* at 42. She indicated she could provide Father the insurance cards in a couple of days. After further discussion, the court stated: "[W]e're not at trial, we're just, I'm just trying to do a little case management while we're all here anyway." *Id.* at 70. Upon questioning by the court, Father stated that he was not working, was "off unemployment, but that will be resolved in the next week," and that he was looking for work. *Id.* at 102. Mother stated that she was working at a hospital earning $13.50 per hour, worked thirty hours per week, and paid $40 per week to a childcare provider. The court then passed out a Child Support Obligation Worksheet "based on the information that was just provided under

oath to the Court." *Id.* at 105. The following exchange occurred between the court and Father:

> THE COURT: . . . Sir, I did impute you at full time minimum wage income as you are able bodied and capable of work. Uh, I did not compute any other income. Now, this is temporary in the truest sense of the word, okay, meaning it will be effective today. The matter of retroactivity and what support should be on a longer term basis going forward or retroactive will be still be decided by the Court at a future date. This is simply to, uh, provide support between now and the time the Court enters a more permanent order. I will also enter a temporary order regarding parenting time. Father will have parenting time for two nights every other weekend – thank you – as is the current schedule, as well as one midweek parenting time. I am not ordering standard Indiana Parenting Time Guidelines right now, but this is going to be, again, just like the child support order temporary in the truest sense of the word, meaning we will basically ignore what the Court just did when we decide this in the future. I believe this will not prejudice [Father] as the extended parenting time would not even necessarily come into play because the Court anticipates holding a hearing and entering a permanent order in the immediate future. Does that make sense to you, sir?
>
> [Father]: That makes sense.

*Id.* at 105-106.

[15] On March 7, 2017, the court entered an order scheduling an evidentiary hearing on all pending issues for May 9, 2017, sustaining Mother's objection to Father's request for production of documents for her attendance records at work as well as cellular phone services providers' records, denying Father's request for an

interlocutory appeal, noting that GAL Artusi reported that he will have a supplemental report completed within thirty days, and ordering Father to meet with GAL Artusi on March 7, 2017. The order also stated that Father was to pay the temporary amount of $79 per week child support effective March 2, 2017, and that, on a temporary basis, he would have parenting time two overnights every other weekend and one midweek non-overnight.

[16] Father subsequently filed a subpoena duces tecum for Mother's college and clinical schedule, a Motion to Compel Discovery, and a motion requesting the court to vacate its March 7, 2017 order pursuant to Trial Rule 60(B).

[17] On April 20, 2017, the court held a status hearing, the parties discussed discovery, Father indicated he was still waiting for a more specific work schedule from Mother, and the court ordered Mother to turn over a work schedule within seven days. Father noted his request for a continuance, and the court stated that it did not think it would be in the children's best interests to delay trial any further, that Father could have "brought a lot of those matters to the Court long before and . . . chose not to," and that the court had mentioned at the last hearing that Father proceeding without counsel was a bad idea. *Id.* at 145. The court asked Father if he was working, and he replied: "I will be working in the next couple weeks temporary . . . ." *Id.* at 146. That same day, the court entered an order denying Father's request to continue the trial and confirming the evidentiary hearing scheduled for May 9, 2017.

[18] On April 24, 2017, Father filed a motion for continuance alleging in part that a medical care provider informed him that "once the medical record authorization form is complete, there will be a three (3) to six (6) week turnaround time for Father to receive copies of the medical records." Appellant's Appendix Volume V at 26. In a supplemental report dated April 25, 2017, GAL Artusi indicated he interviewed Father's brother, David Richter ("David"), and Mother's sister, Gabby Sexton ("Gabby"), and again recommended that Father undergo an initial intake with Oaklawn or another equivalent facility.

[19] On May 8, 2017, Father filed a motion to compel discovery referencing his subpoena duces tecum for Mother's college and clinical schedule and another motion for a continuance in which he alleged that he requested a copy of the investigation file pursuant to Ind. Code § 31-17-2-12(c)(1)(2)(3) on March 23, 2017, and that he finally received the information requested on May 5, 2017.

[20] On May 9, 2017, the court held a hearing, denied Father's motion to compel, and denied Father's motion for continuance. GAL Artusi testified regarding his concerns with Father. Mother testified that she lived with Father until December 2015 and removed herself and the children from that situation because there were episodes of paranoia and delusions and a history of domestic violence. She testified that she was employed as a phlebotomist and a server and was in the nursing program at Bethel College, that she was always the primary caregiver, that she found a tape recorder in their apartment when she lived with Father, the electrical outlets were taken apart, the smoke

detectors were taken down, Father was looking for cameras, and he would be searching the carport all hours of the night. She stated that he dismantled one of the air fresheners and an alarm clock and that his accusations scare her.

[21] Mother's counsel referred to the allegations in Father's May 27, 2016 Verified Emergency Petition for Physical Custody, and Mother indicated that Father was alleging she stole the children's television he had bought them and that he had awoken to find Mother standing in his living room dressed in scrubs looking into his eyes before running out the back door. Mother testified that she did not break into Father's house or stand over him while he was asleep and that such allegations show that Father has a delusional state of mind.

[22] Father presented testimony from three of his neighbors who stated that the children seemed happy around him and he had not displayed any paranoia. Father called Mother as a witness and, when asked why she filed her petition to establish supervised parenting time and appointment of guardian ad litem, she responded that Father took the children from daycare for four days, did not return them, and was making accusations of "planting tape recorders, looking for tape recorders, looking for cameras . . . ." Transcript Volume III at 95.

[23] Father testified, as an explanation for one of the photographs Mother introduced, that he "lost about forty grand cash and quarter of a million out on a contract" in 2014 and punched a hole in the wall when no one was home. *Id.* at 105. He also testified that he injured his hand in May 2014 and was placed on restricted duty work, and that he had surgery and eight months of physical

therapy and quit working on "January 1st of 2015." *Id.* at 128. He stated that he "worked there until the 1st of January, 2016" and "since then I've been going through . . . a workmans comp battle . . . ." *Id.* at 129. He testified that his hand was "getting better," he was starting a seasonal job the next week, and "they're working around my school schedule." *Id.* at 130.

[24] Father addressed his financial stability and stated: "My bills are paid, I'll take care of myself, I'll be back to work in a week and I'll be able to provide whatever I have to for my children." *Id.* at 131. He testified that he was a full-time student and that Bethel College was more than $14,000 a semester and he had attended Bethel since the previous fall. He stated he had been an electrician in three or four factories and denied taking apart the alarm clock or air freshener. He also stated that the statements attributed to his mother and brother in GAL Artusi's report were fabricated because his mother owes him over $100,000 and he and his brother "don't get along." *Id.* at 172. On redirect, Father testified that his financial aid covers his tuition "100 percent out of one semester for half of a class. . . . [I]t costs me between two and five hundred dollars a year, it's like three something a year to go to school at Bethel." *Id.* at 174. Father stated that he signed a settlement agreement for his worker's compensation, and the court admitted a letter from an attorney for Father's employer which stated that he had agreed to settle for $5,500.

[25] On September 12, 2017, the court entered an order that: confirmed Father as the father of G.R. and E.R.; granted Mother primary physical custody; ordered Father to undergo a psychological assessment and follow-up with any treatment

recommendations; found Mother's testimony to be more compelling than Father's; found that Father's filings had been repetitive, frivolous, and invasive; granted a temporary award of joint legal custody to Mother and Father to become permanent following Father's compliance with the psychological assessment; ordered Father to pay $79 per week in child support plus $21 per week on the arrearage and $1,000 out of the proceeds he receives from his worker's compensation settlement; ordered Father to notify Mother's counsel when he receives the settlement, the total amount he receives, and to disclose where the rest of the money is spent; and ordered Father to pay Mother's counsel $6,778.75 based on the volume and nature of Father's filings.

## *Discussion*

[26] Before addressing Father's arguments, we note that Mother did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing arguments, and we apply a less stringent standard of review, that is, we may reverse if the appellant establishes *prima facie* error. *Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006). This rule was established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. *Wright v. Wright*, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002). Questions of law are still reviewed *de novo*. *McClure v. Cooper*, 893 N.E.2d 337, 339 (Ind. Ct. App. 2008).

## I.

[27] The first issue is whether the trial court abused its discretion in ordering Father to pay attorney fees. Father argues that he was unemployed for a period of time but has since gained employment which is less than the income Mother earns, he suffered a work-related injury in May of 2014 making it difficult for him to obtain stable high-paying work without a college degree, he has incurred severe financial hardships due to Mother's initiation of this action, and Mother has refused to provide him with certain requested information resulting in him filing subpoenas duces tecum.

[28] Generally, Indiana has consistently followed the American Rule in which both parties pay their own fees. *Loparex, LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 815-816 (Ind. 2012). In the absence of statutory authority or an agreement between the parties to the contrary—or an equitable exception—a prevailing party has no right to recover attorney fees from the opposition.[3] *Id.* at 816.

[29] Father cites Ind. Code § 34-52-1-1, which provides:

> (a) In all civil actions, the party recovering judgment shall recover costs, except in those cases in which a different provision is made by law.
>
> (b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

---

[3] There are three well-established common-law exceptions to the American Rule: the "obdurate behavior" exception, the "common fund" exception, and the "private attorney general" exception. Indiana embraces the first two of these and not the third. *Loparex, LLC*, 964 N.E.2d at 816 n.5.

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

[30] Pursuant to Ind. Code § 31-14-18-2(a)(2), the trial court in a paternity action may order a party to pay a reasonable amount for attorney fees incurred by the other party. In making such an award, the court should consider the parties' resources, their economic conditions, their respective earning abilities, and other factors that bear on the reasonableness of the award. *In re Paternity of S.A.M.*, 85 N.E.3d 879, 890 (Ind. Ct. App. 2017). The court may also consider any misconduct by one party that causes the other party to directly incur fees. *Id. See also* Ind. Code § 31-16-11-1 (providing that a trial court may periodically order a party to a child support proceeding to pay a reasonable amount for attorney fees); Ind. Code § 31-17-7-1 (same for proceedings for modification of custody and parenting time).

[31] The trial court ordered Father to pay Mother's attorney fees accrued following the withdrawal of his counsel "[b]ased on the volume and nature of Father's filings." Appellant's Appendix Volume V at 69. The record reveals that Father filed numerous *pro se* motions and petitions following the withdrawal of his attorney which required Mother to incur attorney fees. We note that Father failed to appear for the December 8, 2016 hearing, at which the court dismissed Father's August 9, 2016 motion with prejudice. During the May 9, 2017

hearing, the court referenced the significant amount of time Father had to serve discovery requests and stated that it did not believe the information Father sought would help the court make a decision. In light of Father's numerous motions and petitions and under the circumstances, we cannot say the trial court abused its discretion by ordering Father to pay Mother's attorney fees following the withdrawal of his counsel.

## II.

[32] The next issue is whether the trial court erred in ordering Father to undergo a psychological examination. Father asserts that no good cause was ever established and that Ind. Trial Rule 35 limits an examination to a physician and the court erroneously ordered him to undergo a psychological assessment at Oaklawn or another community health service provider. He also asserts that the order to release any potential medical records or treatments to the guardian ad litem and Mother is a direct violation of his physician-patient privilege and Ind. Code §§ 16-39-3-3, -4, -5, and -7.

[33] Ind. Trial Rule 35(A) provides:

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and

scope of the examination and the person or persons by whom it is to be made.

[34] In his letter dated January 6, 2017, GAL Artusi wrote that he interviewed Mother who noted some major concerns about Father and his mental stability. His letter stated that "[a]s [the children] are very young, both under the age of 5, if Father is experiencing issues with paranoia, bi-polar, depression or fits of anger then this directly impacts the children and their mental and physical health moving forward." Appellant's Appendix Volume V at 75. GAL Artusi also stated that he found it hard to believe the truthfulness and veracity of a number of statements made to him by Father, that he shared many concerns with Mother relating to Father's current mental stability, and that "[a]t the end of the day I believe that my analysis is spot on that Father is suffering from some type of mental deficiency or illness." *Id.* at 80.

[35] In his April 25, 2017 report, GAL Artusi indicated that he spoke to Father's brother, David, who "talked about the fact that [Father] has always had a sense of paranoia in his life," and told him that a court had previously ordered a psychological evaluation, and that Father did not follow through. *Id.* at 86. GAL Artusi reported that he spoke with Father's mother who was very reluctant to speak about the case but confirmed that there was a court proceeding in Illinois approximately ten years ago and that Father "twisted her actions to be evil and that this was not her intent at all." *Id.* at 87. GAL Artusi also reported that he spoke with Mother's sister, Gabby, who reiterated a

number of things he heard from Mother and David and said that Father was paranoid and "thinks someone is out to get him." *Id.* at 88.

[36] At the May 9, 2017 hearing, GAL Artusi was questioned about his interviews with David, Gabby, and Mother, and stated his concern for the children when they are around Father.

[37] We observe that the court ordered that the psychological assessment be marked and filed as confidential. Based upon the record, including GAL Artusi's testimony and reports as well as Mother's testimony, which the court found more credible than Father's testimony, and considering the best interests of the children, we cannot say that reversal is warranted.

### III.

[38] The next issue is whether the court abused its discretion in determining Father's support obligation. Father argues that he is a full-time student and was unemployed for six months in 2016 due to work restrictions from an injury, and that his support obligation should be calculated on his actual gross income. He also argues that the trial court abused its discretion in ordering him to disclose to Mother's counsel where the remainder of his worker's compensation settlement is spent. He asserts that Ind. Trial Rule 26(C) protects him from a fishing expedition, that this information is irrelevant, and that Mother's counsel never requested the disclosure of this information.

[39] Ind. Code § 31-16-6-1 provides:

(a) In an action for . . . child support under IC 31-16-2, or establishment of paternity under IC 31-14, the court may order either parent or both parents to pay any amount reasonable for support of a child, without regard to marital misconduct, after considering all relevant factors, including:

(1) the financial resources of the custodial parent;

(2) the standard of living the child would have enjoyed if:

(A) the marriage had not been dissolved;

(B) the separation had not been ordered; or

(C) in the case of a paternity action, the parents had been married and remained married to each other;

(3) the physical or mental condition of the child and the child's educational needs; and

(4) the financial resources and needs of the noncustodial parent.

[40] Decisions concerning the payment of child support rest within the sound discretion of the trial court. *Douglas v. Spicer*, 8 N.E.3d 712, 714-715 (Ind. Ct. App. 2014), *reh'g denied*. On review, we will reverse a trial court's decision in child support matters where we find that there was an abuse of discretion or if the trial court's determination on the issue is contrary to law. *Id.*

[41] Child Support Guideline 3A addresses the definition of weekly gross income for purposes of determining child support. Paragraph 1 of Child Support Guideline 3A provides that "'weekly gross income' is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon 'in-kind'

benefits" and "includes, but is not limited to, income from salaries, wages, . . . social security benefits, workmen's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, inheritance, . . . ."

[42] Paragraph 3 of Child Support Guideline 3A provides:

> *Unemployed, Underemployed and Potential Income.* If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community. If there is no work history and no higher education or vocational training, the facts of the case may indicate that Weekly Gross Income be set at least at the federal minimum wage level.

[43] Paragraph 2 of the Commentary to Child Support Guideline 3A provides in part: "Potential income may be determined if a parent has no income, or only means-tested income, and is capable of earning income or capable of earning more. Obviously, a great deal of discretion will have to be used in this determination."

[44] The record does not contain a copy of the worksheet referred to by the court. Transcript Volume III at 130. Father addressed his financial stability and stated: "My bills are paid, I'll take care of myself, I'll be back to work in a week and I'll be able to provide whatever I have to for my children." *Id.* at 131. He indicated that he was going to start working at a lawn care company earning ten

dollars per hour and Jake's Fireworks earning nine dollars per hour and would work between thirty and forty hours between both jobs. He stated that he was paying rent on his house and that "There was money that I had . . . and my dad's been loaning me some money as well until my injury got to the point where I could work again." *Id.* at 159. On redirect, Father stated:

> I'm not objecting to paying support. You order me to pay support, I'll pay support. I – I addressed with him that – And anything that from the order on is owed will be paid the minute I get it this check and when it comes to arrearage I don't know how that works. So if it's coming out per week I can do it that way and, and then make another large sum payment towards it so she, she can get some of it back right away. I don't know, but I can guarantee from the court order on is paid and I'll be paying going forward and then whatever arrearage is tacked on to that but I will make an additional payment. The tuition at Bethel that you brought up. Yes, Bethel is expensive, but my financial aid covers my Bethel tuition 100 percent out of one semester for half of a class. So to put it in the Court's perspective it costs me between two and five hundred dollars a year, it's like three something a year to go to school at Bethel.

*Id.* at 174.

We cannot say that the trial court abused its discretion in ordering that Father pay child support in an amount calculated based upon the federal minimum wage.

[45] To the extent Father challenges the court's order that he produce an accounting related to his worker's compensation settlement, we cannot say that such an accounting order is not a legitimate exercise of the trial court's authority to

make inquiry regarding the financial resources available to the parties for support. *See* Ind. Code § 31-16-6-1 (providing that "the financial resources and needs of the noncustodial parent" is a relevant factor in determining a reasonable amount for child support"). Under the circumstances, the court did not abuse its discretion in entering the accounting order.

## IV.

[46] The next issue is whether the trial court erred by denying Father's motion for change of judge. Ind. Trial Rule 76 provides in part:

> (B) In civil actions, where a change may be taken from the judge, such change shall be granted upon the filing of an unverified application or motion without specifically stating the ground therefor by a party or his attorney. Provided, however, a party shall be entitled to only one [1] change from the judge. After a final decree is entered in a dissolution of marriage case or paternity case, a party may take only one change of judge in connection with petitions to modify that decree, regardless of the number of times new petitions are filed. The Rules of Criminal Procedure shall govern proceedings to enforce a statute defining an infraction.
>
> (C) In any action except criminal no change of judge or change of venue from the county shall be granted except within the time herein provided. Any such application for change of judge (or change of venue) shall be filed not later than ten [10] days after the issues are first closed on the merits. Except:
>
> > (1) in those cases where no pleading or answer may be required to be filed by the defending party to close issues (or no responsive pleading is required under a statute), each party shall have thirty [30] days from the date the

case is placed and entered on the chronological case
summary of the court as having been filed . . . .

[47] On January 20, 2016, Mother filed a Petition to Establish Rights Incident to Paternity Pursuant to Ind. Code § 16-37-2-2.1. Father did not file his motion for change of judge until December 30, 2016.[4] Father had only thirty days in which to file his request pursuant to Ind. Trial Rule 76(C) from the date the case was entered on the chronological case summary in January 2016. Accordingly, we cannot say that reversal is warranted on this basis.

V.

[48] The next issue is whether the trial court erred in determining the custody of children. The court's findings control as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). When a trial court has made findings of fact, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. *Id.* Findings will be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* To

---

[4] The motion is titled "MOTION TO CHANGE JUDGE" with the handwritten word "Amended" prior to the title. Appellant's Appendix Volume IV at 89. In his brief, Father does not assert that any motion for change of judge was filed earlier.

determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.* A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[49] A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 945-946 (Ind. Ct. App. 2006). Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses, or substitute our judgment for that of the trial court. *Id.* at 946. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. *Id.*

[50] The standard for an initial custody determination is set forth in Ind. Code § 31-14-13-2, which provides:

> The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> > (1) The age and sex of the child.
> >
> > (2) The wishes of the child's parents.
> >
> > (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> >
> > (4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

[51] At the May 9, 2017 hearing, GAL Artusi testified that he continued to believe that granting Mother physical custody of the children was in their best interests. When asked by Father if he thought it would be appropriate to have joint legal and physical custody, GAL Artusi answered: "Currently, no." Transcript Volume II at 203. Based upon the record, we conclude that the trial court did not err in granting Mother primary physical custody of the children and a temporary award of joint legal custody to Mother and Father with the grant becoming permanent following Father's compliance with the order.

VI.

[52] The next issue is whether the court abused its discretion in denying Father a continuance. Father points to his subpoena duces tecum for Mother's college and clinical schedule and argues that these requested records "were material to

prove or disprove a specific fact and/or a particular element in issue, pertaining to the wellbeing of the children while in the care of a third party without the presence of Mother and/or Father." Appellant's Brief at 42. He contends that he was seeking to prove or disprove his "right of first refusal and possible endangerment of children in the care of a third party." *Id.* at 43. He also argues that he did not receive GAL Artusi's case file until May 5, 2017, he was required to receive the file at least ten days prior to trial which occurred on May 9, 2017, and that GAL Artusi's actions did not give him adequate time to prepare a defense or serve subpoenas to any persons interviewed by GAL Artusi.

[53] The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court. *Litherland v. McDonnell*, 796 N.E.2d 1237, 1240 (Ind. Ct. App. 2003), *trans. denied*. We will reverse the trial court only for an abuse of that discretion. *Id.* "An abuse of discretion may be found on the denial of a motion for a continuance when the moving party has shown good cause for granting the motion." *Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), *trans. denied*; *see* Trial Rule 53.5. A trial court abuses its discretion when it reaches a conclusion which is clearly against the logic and effect of the facts or the reasonable and probable deductions which may be drawn therefrom. *Hess v. Hess*, 679 N.E.2d 153, 154 (Ind. Ct. App. 1997). If good cause is shown for granting the motion, denial of a continuance will be deemed to be an abuse of discretion. *Id.* No abuse of

discretion will be found when the moving party has not shown that he was prejudiced by the denial. *Litherland*, 796 N.E.2d at 1240.

[54] The record reveals that delays were attributable to Father, who failed to appear at the December 8, 2016 hearing, and GAL Artusi testified regarding his difficulties in receiving responses from Father. Indeed, in March 2017, the court ordered Father to meet with GAL Artusi. As pointed out by the trial court, Mother filed her initial petition on January 20, 2016, and Father did not file his subpoena duces tecum for her college and clinical schedule until March 24, 2017. At the April 20, 2017 hearing, the court stated that Father could have "brought a lot of those matters to the Court long before and . . . chose not to." Transcript Volume II at 145.

[55] To the extent Father asserted in his May 8, 2017 motion for continuance, filed a day before the hearing, that he requested a copy of the "investigation file and pertaining information" pursuant to Ind. Code § 31-17-2-12(c)(1)(2)(3) on March 23, 2017, and that he finally received the information requested on May 5, 2017, Appellant's Appendix Volume V at 50, we observe that Ind. Code § 31-17-2-12(c) provides:

> The court shall mail the investigator's report to counsel and to any party not represented by counsel at least ten (10) days before the hearing. The investigator shall make the following available to counsel and to any party not represented by counsel:
>
> > (1) The investigator's file of underlying data and reports.
> >
> > (2) Complete texts of diagnostic reports made to the investigator under subsection (b).

(3) The names and addresses of all persons whom the investigator has consulted.

[56] GAL Artusi's report dated January 6, 2017, includes a certificate of service indicating that a copy of the report was served by mail on Father. Father does not allege that he did not receive this report. Indeed, he filed a motion for enlargement of time to respond to the report. GAL Artusi's supplemental report dated April 25, 2017, contained a certificate of service asserting that a copy of the report was served by mail on Father. Again, father does not allege he did not receive this report. To the extent he did not receive the "investigation file and pertaining information" until May 5, 2017, Father does not develop a cogent argument that any information from the "investigation file and pertaining information" was not already in GAL Artusi's reports or explain how he was prejudiced. Under the circumstances, we conclude that the trial court did not abuse its discretion in denying Father's motion for a continuance.

## *Conclusion*

[57] For the foregoing reasons, we affirm the trial court's order.

[58] Affirmed.

Bailey, J., and Crone, J., concur.